1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: 310-405-7190
Email: jpafiti@pomlaw.com

*Co-Lead Counsel for Plaintiffs and
the Proposed Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS SPITZER, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>      v.<br><br>ROBERT C. FLEXON, DARREN R. JAMISON, JOHN J. JURIC, SCOTT W.  ROBINSON, and FREDERICK S. HENCKEN III,<br><br>            Defendants. | Case No. 2:23-cv-08659-HDV-MAR<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

– 1 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

Lead Plaintiff Michael Denisevich and additional plaintiff Kevin Rudisill ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants Robert C. Flexon ("Flexon"), Darren R. Jamison ("Jamison"), Scott W. Robinson ("Robinson"), and Frederick S. Hencken III ("Hencken") (collectively "Defendants") alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Capstone Green Energy Corp. and its affiliates ("Capstone" or the "Company"),[1] the bankruptcy cases involving Capstone and its affiliates including the lead case styled as *In re: Capstone Green Energy Corporation, et al.,* Case No. 23-11634-LSS (Bank. D. Del.) (the "Capstone Bankruptcy"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a class action on behalf of persons or entities who purchased publicly traded Capstone securities between November 11, 2020 and October 4, 2023, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

---

[1] Capstone and its subsidiaries have undergone substantial restructuring in connection with the bankruptcy proceedings. None of these entities are defendants in this action.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

2.    In 2021, Capstone, an unprofitable manufacturer of energy generating "microturbines" was saddled with more than $50 million in debt that was set to come due on October 1, 2023. Not having that much cash available, and without the ability to generate positive cash flow, the only possibility for Capstone to survive was to obtain additional financing to pay back its debts.

3.    But Capstone faced further problems. First – in order to recognize revenue, the Company was required to actually ship its products to customers, but the Company had a long backlog of orders that was exacerbated by the COVID-19 pandemic, a backlog that sometimes exceeded 18 months. Second, Capstone was running up significant expenses from its Factory Protection Plan ("FPP") program – a type of extended warranty program where Capstone received fixed payments in exchange for providing servicing and spare parts free of charge. Rather than solve these problems through better management, Capstone instead falsified its financial statements. To improve its reported revenues, the Company improperly recognized revenue for phony "bill-and-hold transactions" in violation of the U.S. Generally Accepted Accounting Principles ("GAAP"), shipping its products to third party warehouses and booking revenue as though the products were actually delivered to customers. To artificially understate their expenses, Capstone first set an improper revenue recognition policy where it did not recognize expenses for replacement parts under the FPP until they were shipped to customers, and then delayed shipment of parts to delay recognition of those expenses. Ultimately, Capstone's fraudulent accounting led to the Company being unable to file its annual and quarterly reports on June 30 and August 18, 2023, and ultimately admitting, on September 22, 2023 that it had improperly recognized revenue from bill-and-hold transactions, swiftly followed by Capstone filing for bankruptcy.

4.    Finally, nearly one year after the house of cards began to fall, Capstone filed its Amended 2022 Annual Report which more fully publicly revealed Defendants' misconduct including causing the Company to issue myriad false

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

1    statements over years of their scheme.

2    5.    The central focus of the scheme is, of course, Capstone. Founded in

3    1988, Capstone has been commercially producing microturbine generators since

4    1998. Throughout its existence, Capstone has incurred annual operating losses. To

5    keep the Company running after decades of losses, Capstone entered into a debt

6    financing instrument with subsidiaries of Goldman Sachs on February 4, 2019 ("the

7    Note Agreement", discussed in depth below). However, by the beginning of the

8    Class Period, it was apparent that Capstone would not be able to repay the Amended

9    Note Agreement, with Capstone only having $16.8 million in cash on hand and

10   losses of $6.8 million for the six months ended September 30, 2020.

11   6.    On October 1, 2020, the Note Agreement was amended through an

12   Amended and Restated Note Purchase Agreement to $50.0 million payable on

13   October 1, 2023 (the "Amended Note Agreement"). However, Capstone would not

14   be able to repay the Amended Note Agreement either, with Capstone only having

15   $49.5 million in cash on hand and losses of $20.8 million for the year ended March

16   31, 2021.

17   7.    Given Capstone's inability to fund itself from ongoing operations,

18   Defendants were desperate to raise financing and to do so needed to report revenue

19   growth. However, the Company was plagued by a lengthy (though misstated)

20   backlog of products it was required to deliver. According to Capstone's revenue

21   recognition policies, Capstone could not recognize revenue until it actually

22   delivered the product to the customer. Rather than simply clear the backlog,

23   however, Capstone instead began secretly and improperly recognizing revenue for

24   "bill-and-hold" transactions.

25   8.    Bill-and-hold transactions are transactions where a seller recognizes

26   revenue even though the seller still physically holds the purchased inventory.

27   Recognizing revenue from such transactions is only permissible when companies

28   meet certain specific conditions, including that the arrangement is at the request of

– 4 –

the buyer, and that the items purchased are kept separate within the seller's facilities. In addition, because a company must disclose its revenue recognition policies, if it does recognize revenue from bill-and-hold transactions, it must so disclose in its financial statements.

9.     Similarly, Defendants caused Capstone to delay shipments of parts to customers to artificially deflate its expenses. Relying on the same recognition policy (whereby shipments and deliveries are the trigger), Defendants "delayed shipment of available parts under the FPP and delayed recording the associated expense on the Company's financial statements."

10.     In connection with the shipping delays, Defendants also sent parts to third party warehouses instead of customers in furtherance their scheme.

11.     In reality, beginning at least as early as its November 10, 2020 quarterly report, Capstone began recognizing revenue from bill-and-hold transactions and improperly delaying expenses that it was later forced to admit were improper under GAAP and its own policies. Worse yet, it failed to even disclose that it engaged in such transactions, instead disclosing a revenue recognition methodology that is inconsistent with the use of bill-and-hold transactions.

12.     While this was ongoing, Capstone was trying, unsuccessfully, to either obtain new financing, or find an acquirer. Ultimately, those efforts were unsuccessful, but the Defendants continued to reap substantial income streams from the failing Company.

13.     Defendants' scheme, including improper revenue recognition of bill-and-hold transactions and shipping and delivery shenanigans, also led to its inability to timely file its 10-K on June 30, 2023 and 10-Q on August 15, 2023. On September 22, 2023, the Company filed a Form 8-K in which it disclosed its improper use of bill-and-hold transactions. On September 28, 2023, the Company filed for bankruptcy. Nearly one year later, Capstone finally filed its Amended 2022 Annual Report which revealed further depths of the scheme.

14.   As a result of Defendants' misstatements, the price of Capstone's stock declined precipitously, harming investors.

## II.   JURISDICTION AND VENUE

15.   The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

17.   Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered, and the subsequent damages took place in, this judicial district.

18.   In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

19.   Further, relevant non-party Capstone is headquartered in this judicial district at 16640 Stagg Street, Van Nuys, California 91406 and Defendants' misconduct originated from within this judicial district.

## III.   PARTIES

### A.   Plaintiffs

20.   Lead Plaintiff Michael Denisevich, as set forth in the previously filed Certification (Dkt. No. 20-2), purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.   Plaintiff Kevin Rudisill, as set forth in the previously filed Certification (Dkt. No. 43-1), purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the

– 6 –

alleged corrective disclosure.

**B.  <u>Defendants</u>**

22.    Defendant Flexon has served as a Director of Capstone since April 2018, as Chair of the Board of Directors from January 2021 to August 9, 2023 and again starting April 1, 2024, as Executive Chairman of the Board from August 9, 2023 to March 31, 2024, and as Interim President and Chief Executive Officer ("CEO") from August 22, 2023 to March 10, 2024. Defendant Flexon served on the Board's Audit Committee during the Class Period until August 14, 2023.

23.    Defendant Jamison served as the Company's President, CEO and Director from 2006 until August 22, 2023. Defendant Jamison served as the Company's President, CEO and Director at the time of many of the alleged false and misleading statements.

24.    Defendant Robinson served as the Company's Interim Chief Financial Officer (serving as the Company's principal financial officer and principal accounting officer), Treasurer and Secretary from July 8, 2022 until March 6, 2023.

25.    Defendant Hencken served as the Company's Chief Financial Officer ("CFO") from January 1, 2020 to July 8, 2022. Earlier, Defendant Hencken served as the Company's Controller from October 2017 to April 2019, and as Interim CFO from October 2019 to January 2020.

26.    Each of the Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in improperly inflating revenue (through, among other things, improper bill-and-hold transactions) and deflating expenses (through, among other things, improper delays in

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

shipping) alleged herein;

(e)      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(f)      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(g)      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(h)      approved or ratified these statements in violation of the federal securities laws.

## IV.    <u>RELEVANT NON-PARTY</u>

27.      Relevant non-party Capstone purports to be a provider of customized microgrid solutions and on-site energy technology systems.[2] Capstone is incorporated in Delaware and its head office is located at 16640 Stagg Street, Van Nuys, California. Capstone's common stock traded on the NASDAQ under the ticker symbol "CGRN" until October 4, 2023 and trades on the Over-the-Counter ("OTC") Expert Market under the ticker symbol "CGRNQ."[3]

28.      Defendants' malfeasance is still reverberating the successor-entity of Capstone. For instance, on July 1, 2024, Capstone filed yet another Notification of

---

[2] On April 22, 2021, Capstone Turbine Corporation changed its name to Capstone Green Energy Corporation.

[3] "Quotations in Expert Market securities are restricted from public viewing. Only broker-dealers and professional or sophisticated investors are permitted to view quotations in Expert Market securities."
https://web.archive.org/web/20240327210934/https://www.businesswire.com/news/home/20231009211214/en/Capstone-Green-Energy-Transitions-to-OTC-Expert-Market-Following-Nasdaq-Delisting.

Late Filing on Form 12b-25 for the year ended March 31, 2024 with the SEC due to the necessary restatements filed in June 2024 more thoroughly discussed throughout this complaint.

## V.     **BACKGROUND INFORMATION**

### A.     *Background on Capstone*

29.     Capstone advertises its microturbines as a green energy solution because it can operate on a variety of fuels including natural gas, hydrogen blend fuels, renewable natural gas, and "flare gas" – that is, gas that would otherwise be lost during an oil flare.

30.     As of April 2021, Capstone stated that it had four key business lines. They are: 1) Energy as a Service ("EaaS"), i.e., rental and service contracts; 2) Energy Generation Technologies ("EGT")[4], i.e. Capstone's core microturbine sales business, which Defendant Jamison called "the backbone on which Capstone was built, and it's based on Capstone's core microturbine technology, that you're all familiar with[.]";[5] 3) Energy Storage Solutions ("ESS"); and 4) Hydrogen & Sustainable Products ("H2S"). According to Capstone's SEC filings and bankruptcy disclosures, ESS and H2S are emerging business lines that do not generate a material portion of revenue. Among the services offered by Capstone is the Factory Protection Plan, or FPP, a service whereby a customer pays a fixed fee in exchange for Capstone performing regularly scheduled and unscheduled maintenance as needed. As a result of the way FPPs are structured, Capstone receives regular fixed payments from customers but from time to time incurs expenses that vary depending on the needs of the customer, including providing replacement parts at no charge.

31.     Capstone long suffered from a significant production backlog, warning

---

[4] The Company has also called this "key business line" "Energy Conversion Products" or "ECT".
[5] 4Q21 Earnings Call, June 10, 2021.

investors as early as 2016 that many of its products faced a backlog of 18 months or more. The COVID-19 pandemic exacerbated their backlog, with Defendant Jamison stating on an August 11, 2022 earnings call that "we're in trouble keeping up" with the backlog and that although "***we haven't missed a delivery date yet*** … it's very, very challenging." Given that Capstone was not actually paid the bulk of the fees for its microturbines until it shipped microturbines, its extensive backlog presented a serious cashflow challenge to Capstone, requiring it to depend on debt financing in order to survive.

### B. Background on the Note Agreement

32.     To solve the problem created by its covertly mismanaged backlog, on February 4, 2019, Capstone entered into the Note Agreement. Capstone used the entirety of the Company's assets[6] as collateral. The Note Agreement has been amended and restated several times over the years. Of particular note, the Note Agreement, as amended and restated, required the Company to meet certain (sales- and revenue-focused) criteria by certain dates.

33.     The Note Agreement and Amended Note Agreement were between Capstone and Goldman Sachs Specialty Lending Holdings, Inc. as purchaser and Goldman Sachs Specialty Lending Holdings, Inc., as collateral agent ("Goldman"). Originally, under the Note Agreement, the Company sold to Goldman senior secured notes with an aggregate principal amount of $30 million (the "Notes"). The Amended Note Agreement increased the amount of the notes to $50.0 million, due October 1, 2023. The Notes did not amortize and the entire principal balance was due in a single payment on October 1, 2023.

34.     The Note Agreement and Amended Note Agreement contained customary events of default, including for breaches of covenants and

---

[6] Obligations under the Note Agreement are secured by all of the Company's assets, including intellectual property and general intangibles. *See e.g.*, 3Q23 Report (defined below).

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

representations and warranties. In the case of an event of default by Capstone, Goldman was entitled to accelerate the payment of all obligations under the Notes. One of the covenants included in both the Note Agreement and Amended Note Agreement was that Capstone must "keep proper books of record and accounts in which full, true, and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities." It also required Capstone to hit certain EBITDA milestones by year.

35.     Throughout the Class Period, it was apparent that Capstone would not have sufficient funds to repay the principal on the Amended Note Agreement. For instance, Capstone only $49.5 had million in cash on hand as of March 31, 2021 and an annual loss for the fiscal year of $20.8 million. The situation got even worse the following year, with only $22.6 million cash on hand as of March 31, 2022 and an even larger and more unsustainable loss of $22.4 million.

36.     The Amended Note Agreement was further amended several times, on May 31, 2021, July 13, 2022, August 10, 2022, July 3, 2023, August 16, 2023, and September 22, 2023. Several of those amendments were to address Capstone's then-known breaches of various covenants in the Amended Note Agreement, principally related to failing to reach EBITDA targets.

37.     Given Capstone's inability to repay the Amended Note Agreement using cash that it generated from its business activities, it was obvious that Capstone would need additional financing, or to sell itself, in order to repay Goldman. Therefore, in September 2022, Capstone hired Greenhill & Co. to attempt to refinance its debt, but that effort was unsuccessful. Capstone thereafter attempted to sell itself, also unsuccessfully.

38.     Unbeknownst to investors, Capstone's improper accounting was connected to further breaches of covenants which created further false financial statements more fully revealed in the Amended 2022 Annual Report.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

### C.    Capstone's Bankruptcy

39.    On September 28, 2023, Capstone filed for bankruptcy under chapter 11 of the U.S. Bankruptcy Code. *See In re Capstone Green Energy Corporation*, 23-11634 (Bank. D. Del.), Dkt. No. 1. The bankruptcy was based on a prepackaged reorganization plan for which Capstone solicited votes the day before filing for bankruptcy. *See In re Capstone Green Energy Corporation*, 23-11634 (Bank. D. Del.), Dkt. No. 2 ¶ 6.

40.    As of the Petition Date, Capstone had $53.0 million principal outstanding on the Amended Note Agreement.

41.    Capstone claimed several events led to the Chapter 11 cases, including the COVID-19 pandemic, industry headwinds, the unsuccessful sale process, and the most important event: failing to meet the Note Agreement covenants. *Id*. ¶¶ 36-43.

42.    However, the full depths of covenant breaches were still not revealed until the Amended 2022 Annual Report was filed in June 2024.

### D.    Background on Bill-and-Hold Transactions and Accounting

43.    The Financial Accounting Standards Board ("FASB") issues the Accounting Standards Codification ("ASC").[7] ASC 606 is the governing standard for revenue recognition. It encompasses a principles-based approach to revenue recognition, focusing on the transfer of control of goods or services to customers. It emphasizes the importance of accurately reflecting the amount and timing of revenue recognition. ASC 606-10-05-2 – 05-3. An entity is required to recognize revenue in accordance with the following five steps:

  a.  Identify the contract with a customer.
  b.  Identify performance obligations in the contract.

---

[7] "The ASC is the single source codifying all United States Generally Accepted Accounting Principles." *United States Sec. & Exch. Comm'n v. Winemaster*, 529 F. Supp. 3d 880, 893 (N.D. Ill. 2021).

– 12 –

c. Determine the transaction price.

d. Allocate the transaction price to the performance obligations in the contract.

e. Recognize revenue when (or as) the performance obligation is satisfied.

*See* ASC 606-10-05-4.

44.     ASC 606 prohibits revenue recognition unless a contract with a customer meets all of the following criteria:[8]

a. The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.

b. The entity can identify each party's rights regarding the goods or services to be transferred.

c. The entity can identify the payment terms for the goods or services to be transferred.

d. The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).

e. It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer.

ASC 606-10-25-1.

45.     ASC 606 prohibits revenue recognition unless an entity transfers promised goods or services (that is, an asset) to its customer, which occurs when the customer obtains control of the asset. ASC 606-10-25-23. Indicators of transfer of control include the following:

---

[8] An entity may still recognize revenue if it received non-refundable consideration from a customer and one or more of the following has occurred: (a) it has no remaining obligations to transfer goods or services to the customer, (b) contract with the customer has been terminated, or (c) the entity has transferred control of goods or services to the customer and has no further obligation to do so. *See* ASC 606-10-25-7.

– 13 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

a. The entity has a present right to payment for the asset.

b. The customer has legal title to the asset.

c. The entity has transferred physical possession of the asset, however, physical possession may not coincide with control of an asset. For example, in a consignment arrangements, a customer or consignee may have physical possession of an asset that the entity controls. Conversely, in some bill-and-hold arrangements, the entity may have physical possession of an asset that the customer controls.

d. The customer has the significant risks and rewards of ownership of the asset.

e. The customer has accepted the asset.

*See* ASC 606-10-25-30.

46.     FASB issued specific guidance for bill-and-hold transactions under the ASC, which is discussed in ASC 606-10-55-81 through 55-84. Under the ASC:

A bill-and-hold arrangement is a contract under which an entity bills a customer for a product but the entity retains physical possession of the product until it is transferred to the customer at a point in time in the future. For example, a customer may request an entity to enter into such a contract because of the customer's lack of available space for the product or because of delays in the customer's production schedules.

ASC 606-10-55-81.

47.     Revenue recognition for a bill-and-hold transaction requires that specific criteria are met. One such criterion is that:

An entity should determine when it has satisfied its performance obligation to transfer a product by evaluating when a customer obtains control of that product (see paragraph 606-10-25-30). For some contracts, control is transferred either when the product is delivered to the customer's site or when the product is shipped, depending on the terms of the contract (including delivery and shipping terms). However, for some contracts, a customer may obtain control of a product even though that product remains in an entity's physical possession. In that case, the customer has the ability to direct the use of, and obtain substantially all of the remaining benefits from, the product even though it has decided not to exercise its right to take physical possession

– 14 –

of that product. Consequently, the entity does not control the product. Instead, the entity provides custodial services to the customer over the customer's asset.

ASC 606-10-55-82.

48.    The bill-and-hold arrangement must also meet the following four criteria:

    a. The reason for the bill-and-hold arrangement must be substantive (for example, the customer has requested the arrangement).
    b. The product must be identified separately as belonging to the customer.
    c. The product currently must be ready for physical transfer to the customer.
    d. The entity cannot have the ability to use the product or to direct it to another customer.

ASC 606-10-55-83.

49.    Finally, the ASC cautions against further accounting issues with bill-and-hold arrangements by providing:

If an entity recognizes revenue for the sale of a product on a bill-and-hold basis, the entity should consider whether it has remaining performance obligations (for example, for custodial services) [] to which the entity should allocate a portion of the transaction price [].[9]

ASC 606-10-55-84.

50.    Capstone stated that it recognized revenue pursuant to GAAP.

51.    In addition, ASC 606 includes a cohesive set of disclosure requirements aimed at providing users of financial statements with comprehensive information about the nature, amount, timing, and uncertainty of revenue and cash flows arising from the entity's contracts with customers. ASC 606-10-05-5. ASC

---

[9] Internal footnotes omitted.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

606 requires companies to specifically disclose the method by which it recognizes revenue, including if revenue is recognized from Bill-and-Hold transactions:

> An entity shall disclose information about its performance obligations in contracts with customers, ***including a description of all of the following***:
>
> a. When the entity typically satisfies its performance obligations (for example, upon shipment, upon delivery, as services are rendered, or upon completion of service) ***including when performance obligations are satisfied in a bill-and-hold arrangement***
> b. ***The significant payment terms (for example, when payment typically is due***, whether the contract has a significant financing component, whether the consideration amount is variable, and whether the estimate of variable consideration is typically constrained in accordance with paragraphs 606-10-32-11 through 32-13 )
> c. The nature of the goods or services that the entity has promised to transfer, highlighting any performance obligations to arrange for another party to transfer goods or services (that is, if the entity is acting as an agent)
> d. Obligations for returns, refunds, and other similar obligations
> e. Types of warranties and related obligations.

606-10-50-12. (Emphasis added.)

52.    Therefore, if Capstone recognized revenue from bill-and-hold transactions, it was required to specifically disclose it. *See* 606-10-50-17 through 50-19. However, Capstone recognized revenue from bill-and-hold transactions and *did not* disclose it until September 2023.

### E.    The Meaning of a GAAP Restatement

53.    ASC Topic 250, Accounting Changes and Error Corrections, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes,

– 16 –

mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20.

54.    ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

> The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

> An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

> Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

ASC 250-10-45-23.

55.    ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item … for each prior period presented" and "the cumulative effect of the change on retained earnings … as of the beginning of the earliest period presented." ASC 250-10-50-7.

56.    In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors … concludes that any previously issued financial statements … should no longer be relied upon because of an error in such financial statements." Capstone made these required disclosures in its September 22, 2023 Form 8-K.

57.    Such disclosure of non-reliance on previously issued financial statements is associated with what is colloquially called by the accounting

– 17 –

profession a "Big R restatement." A Big R restatement occurs when the error is material to the prior period financial statements. The evaluation of the materiality of a misstatement or omission in financial statements is viewed from the standpoint of a reasonable person and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements. *Staff Acct. Bull. No. 99*, Release No. 99 (Aug. 12, 1999). When an error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

58.     As explained herein, the Company disclosed in its September 22, 2023 Form 8-K that a Restatement would be forthcoming.

### F.     *Capstone's Improper Recognition of Bill-and-Hold Revenue*

59.     Throughout Fiscal 2021, 2022, and 2023, Capstone's already lengthy backlog was further strained by the supply chain issues caused by the COVID-19 pandemic. Rather than close that backlog in reality, Capstone chose to do so on paper by recognizing revenue from projects it had not actually delivered by secretly and improperly treating them as bill-and-hold transactions. To further the scheme, Defendants shipped products to third party warehouses, and then booked revenue for the shipments despite the fact that they had not been shipped to the customer.

60.     According to Capstone's Amended 2022 Annual Report, this allowed Capstone to seriously understate its backlog, which was actually $40.5 million at March 31, 2022 instead of $25.3 million as originally reported in the originally-filed, materially false 2022 Annual Report.

61.     This deception also allowed Capstone to report a materially misleading book-to-bill ratio. The book-to-bill ratio is the ratio of new orders received to units shipped and billed. The Amended 2022 Annual Report revealed that the true book-to-bill ratio for Fiscal 2022 and Fiscal 2021 were 0.9:1 instead of the 1.1:1 book-

to-bill ratio listed in the originally filed, materially false 2022 and 2021 Annual Reports.

62.    This deception was particularly significant because a book-to-bill ratio above 1 indicates that more orders were received than filled which shows growing demand. On the other hand, a book-to-bill ratio under 1 indicates weak demand because the Company received less orders than it filled.[10]

63.    Worse still, Defendants caused Capstone to fail to disclose that it was engaged in bill-and-hold transactions at all.

### G.    Capstone's Improper Delaying of Expenses

64.    In connection with the FPP, from time to time, Capstone was required to provide spare parts to customers at no charge, generating expenses for Capstone. As Capstone admitted in its Restatement, the appropriate time to recognize expenses from such spare part orders was when the customer ordered the spare parts. However, Capstone instead recognized the expenses when the spare parts shipped. Defendants Jamison, Robinson, and Hencken then further abused this improper accounting policy by delaying shipments, thereby further delaying recognition of expenses.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    November 10, 2020 – 2Q21 Report

65.    On November 10, 2020, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2020 which was signed by Defendant Hencken (the "2Q21 Report"). Accompanying the 2Q21 Report were certifications by Defendants Jamison and Hencken, attesting to the accuracy of the information in the 2Q21 Report.

### 1.    Revenue

66.    The 2Q21 Report stated the following, in pertinent part, regarding

---

[10] Id.

Capstone's revenue:

| | Three Months Ended September 30, | |
|---|---|---|
| | 2020 | 2019 |
| Revenue: | | |
| Product, accessories and parts | $ 9,344 | $15,988 |
| Service | 5,562 | 4,752 |
| Total revenue | 14,906 | 20,740 |

67.    The statement above regarding Capstone's revenue was materially false when made. In reality, Capstone's revenue for the quarter was $13,710,000, an overstatement of $1,196,000, or 9%. Additionally, the certifications in ¶ 65 were false when made due to the same misstatement.

**2.    Revenue Recognition**

68.    The 2Q21 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

**13. Revenue Recognition**

On April 1, 2018, the Company adopted the new revenue standard ASU 2014-09 and applied it to all contracts using the modified retrospective method. The Company determined there was no material change in applying the new revenue standard, therefore no adjustment to the opening balance of accumulated deficit was necessary.

The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***

The Company determines revenue recognition through the following steps:

– 20 –

- Identification of the contract, or contracts, with a customer
- Identification of the performance obligations in the contract
- Determination of the transaction price
- Allocation of the transaction price to the performance obligations in the contract
- Recognition of revenue when, or as, the Company satisfies a performance obligation

The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. ***The majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.***

(Emphasis added.)

69.    The statement above in ¶ 68 regarding Capstone's revenue recognition was materially false when made for claiming that revenue is recognized upon shipment because it failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 65 were false when made due to the same misstatement.

**3.    Expenses**

70.    The 2Q21 Report stated that Capstone's costs of goods sold for product, accessories, and parts was $8,693,000. Capstone later reclassified costs of goods sold in its 2021 Annual Report to report costs of goods sold for parts and services of $4,997,000 for the quarter.[11]

71.    The foregoing statement was false and/or misleading because Capstone failed to disclose additional parts and services expenses of $1,019,000

---

[11] *See*, *e.g.*, 2021 Annual Report at 46 demonstrating the reclassification of parts from the product, accessories and parts line to the parts and service line.

– 21 –

from FPP contracts, and additional bill and hold expenses for parts and services of $62,000, resulting in actual costs of goods sold for parts and services of $6,078,000, understating expenses by $1,081,000, or 18%. Additionally, the certifications in ¶ 65 were false when made due to the same misstatement.

**B.    *February 9, 2021 – 3Q21 Report***

72.    On February 9, 2021, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2021 which was signed by Defendant Hencken (the "3Q21 Report"). Accompanying the 3Q21 Report were certifications by Defendants Jamison and Hencken, attesting to the accuracy of the information in the 2Q22 Report.

**1.    Revenue**

73.    The 3Q21 Report stated the following, in pertinent part, regarding Capstone's revenue:

|  | Three Months Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| Revenue: | | |
| Product, accessories and parts | $15,374 | $12,010 |
| Service | 5,302 | 5,373 |
| Total revenue | 20,676 | 17,383 |

74.    The statement above regarding Capstone's revenue was materially false when made. In reality, Capstone's revenue for the quarter was $16,697,000, an overstatement of $ 3,978,000, or 24%. Additionally, the certifications in ¶ 72 were false when made due to the same misstatement.

**2.    Revenue Recognition**

75.    The 3Q21 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

– 22 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

**13.  Revenue Recognition**

On April 1, 2018, the Company adopted the new revenue standard ASU 2014-09 and applied it to all contracts using the modified retrospective method. The Company determined there was no material change in applying the new revenue standard, therefore no adjustment to the opening balance of accumulated deficit was necessary.

The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***

The Company determines revenue recognition through the following steps:

- Identification of the contract, or contracts, with a customer
- Identification of the performance obligations in the contract
- Determination of the transaction price
- Allocation of the transaction price to the performance obligations in the contract
- Recognition of revenue when, or as, the Company satisfies a performance obligation

The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. ***The majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.*** Revenue from service contracts and post-shipment performance obligations is recognized when or as those obligations are satisfied. The Company primarily offers assurance-type standard warranties that do not represent separate performance obligations and will separately offer and price extended warranties that are separate performance obligations for which the associated revenue is recognized over-time based on the extended warranty period. The Company records amounts billed to customers for reimbursement of shipping and

– 23 –

handling costs within revenue. Shipping and handling costs associated with outbound freight after control over a system has transferred to a customer are accounted for as fulfillment costs and are included in cost of goods sold. Sales taxes and other usage-based taxes are excluded from revenue.

Comprehensive Factory Protection Plan ("FPP") service contracts require payment at the beginning of the contract period. Advance payments are not considered a significant financing component as they are typically received less than one year before the related performance obligations are satisfied. These payments are treated as a contract liability and are classified in deferred revenue in the Condensed Consolidated Balance Sheets. Once control transfers to the customer and the Company meets the revenue recognition criteria, the deferred revenue is recognized in the Condensed Consolidated Statement of Operations. The deferred revenue relating to the annual maintenance service contracts is recognized in the Condensed Consolidated Statement of Operations on a straight line basis over the expected term of the contract.

(Emphasis added.)

76.    The 3Q21 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

The timing of the backlog is based on the required delivery dates requested by our customers. ***Based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.***

(Emphasis added.)

77.    The 3Q21 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

The timing of shipments is subject to change based on several variables

– 24 –

(including customer deposits, payments, availability of credit and delivery schedule changes), most of which are not within our control and can affect the timing of revenue recognition.

78.     The statements above in ¶¶ 75-77 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 72 were false when made due to the same misstatements.

79.     Additionally, the statements above in ¶¶ 75-77 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 72 were false when made due to the same misstatements.

**3.      Expenses**

80.     The 3Q21 Report stated that Capstone's costs of goods sold for product, accessories, and parts was $13,483,000. Capstone later reclassified costs of goods sold in its 2021 Annual Report to report costs of goods sold for parts and services of $4,879,000 for the quarter.[12]

81.     The foregoing statement was false and/or misleading because Capstone failed to disclose additional parts and services expenses of $387,000 from FPP contracts, and additional bill and hold expenses for parts and services of $31,000, resulting in actual costs of goods sold for parts and services of $5,297,000, understating expenses by $418,000, or 8%. Additionally, the certifications in ¶ 72 were false when made due to the same misstatement.

***C.      June 14, 2021 – 2021 Annual Report***

82.     On June 14, 2021, Capstone filed with the SEC its 2021 Annual Report

---

[12] *See e.g.*, 2021 Annual Report at 46 demonstrating the reclassification of parts from the product, accessories and parts line to the parts and service line.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

on Form 10-K for the year ended March 31, 2021 which was signed by Defendants Jamison, Hencken, and Flexon (the "2021 Annual Report"). Accompanying the 2021 Annual Report were certifications by Defendants Jamison and Hencken, attesting to the accuracy of the information in the 2021 Annual Report.

### 1.  Revenue Recognition

83.  The 2021 Annual Report also stated the following, in pertinent part, regarding revenue recognition:

> [B]ecause our backlog represents only the estimated amount of future product revenue to be recognized under negotiated contracts *as shipments convert backlog to recognized revenue for accounting purposes*, we may not be able to fully realize the revenue value reported in our backlog, and our backlog may not be indicative of future revenues. … The timing of the backlog is based on the requirement date indicated by our customers. *Based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. The timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.*

(Emphasis added.)

84.  The 2021 Annual Report also stated the following, in pertinent part, regarding revenue recognition:

> A portion of our backlog is concentrated in the oil and gas market which *may impact the overall timing of shipments or the conversion of backlog to revenue.* The timing of the backlog is based on the requirement date indicated by our customers. *However, based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.*

– 26 –

(Emphasis added.)

85.    The 2021 Annual Report also stated the following, in pertinent part, regarding revenue recognition in its section titled "critical accounting matters":

> Our revenue consists of sales of products, parts, accessories and service, which includes FPPs, net of discounts. Our distributors purchase products, parts and FPPs for sale to end users and are also required to provide a variety of additional services, including application engineering, installation, commissioning and post-commissioning service…. ***We recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, selling price is fixed or determinable and collectability is reasonably assured. Service revenue derived from time and materials contracts is recognized as the service is performed.***

(Emphasis added.)

86.    The 2021 Annual Report also stated the following, in pertinent part, regarding revenue recognition:

> The timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and delivery schedule changes), most of which are not within our control and can affect the timing of our revenue.

87.    The statements above in ¶¶ 83-86 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 82 were false when made due to the same misstatements.

88.    Additionally, the statements above in ¶¶ 83-86 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 82 were false when made due to the same misstatements.

– 27 –

**2.    Expenses**

89.    The 2021 Annual Report stated that Capstone's cost of goods sold for parts and services was $18,756,000 for Fiscal Year 2021.

90.    The foregoing statement was false and/or misleading because Capstone failed to disclose additional parts and services expenses of $206,000 from bill and hold transactions and $2,173,000 from FPP contracts, resulting in actual costs of goods sold for parts and services of $21,135,000, understating expenses by $2,379,000, or 11%. Additionally, the certifications in ¶ 82 were false when made due to the same misstatement.

**D.    *August 11, 2021 – 1Q22 Report***

91.    On August 11, 2021, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2021 which was signed by Defendant Hencken (the "1Q22 Report"). Accompanying the 1Q22 Report were certifications by Defendants Jamison and Hencken, attesting to the accuracy of the information in the 1Q22 Report.

**1.    Revenue**

92.    The 1Q22 Report stated the following, in pertinent part, regarding Capstone's revenue:

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Revenue: | | |
| Product and accessories | $ 8,389 | $ 6,606 |
| Parts and service | 7,693 | 7,587 |
| Total revenue | 16,082 | 14,193 |

93.    The statement above regarding Capstone's revenue was materially false when made. In reality, Capstone's revenue for the quarter was $12,467,000, an overstatement of $3,615,000, or 29%. Additionally, the certifications in ¶ 91 were false when made due to the same misstatements.

– 28 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

**2.      Revenue Recognition**

94.     The 1Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

**13.  Revenue Recognition**

The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***

The Company determines revenue recognition through the following steps:

●      Identification of the contract, or contracts, with a customer
●      Identification of the performance obligations in the contract
●      Determination of the transaction price
●      Allocation of the transaction price to the performance obligations in the contract
●      Recognition of revenue when, or as, the Company satisfies a performance obligation

The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. ***The majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.***

(Emphasis added.)

95.     The 1Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

A portion of our backlog is concentrated in the oil and gas market which ***may impact the overall timing of shipments or the conversion of backlog to revenue***. The timing of the backlog is based on the

– 29 –

requirement date indicated by our customers. ***However, based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.*** ….

(Emphasis added.)

96.    The 1Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

The timing of shipments is variable and based on several factors (including customer deposits, payments, availability of credit and delivery schedule changes), most of which are not within our control and can affect the timing of revenue recognition.

97.    The statements above in ¶¶ 94-96 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 91 were false when made due to the same misstatements.

98.    Additionally, the statements above in ¶¶ 94-96 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 91 were false when made due to the same misstatements.

**3.    Expenses**

99.    The 1Q22 Report stated that its costs of goods sold for parts and service was $4,442,000.

100.    The foregoing statement was false and/or misleading because Capstone failed to disclose additional parts and services expenses of $783,000 from FPP contracts, which was partially offset by an overstatement of bill and hold

– 30 –

expenses for parts and services of $185,000, resulting in actual costs of goods sold for parts and services of $5,040,000, understating expenses by $598,000, or 12%. Additionally, the certifications in ¶ 91 were false when made due to the same misstatement.

### E.    November 10, 2021 – 2Q22 Report

101.    On November 10, 2021, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2021 which was signed by Defendant Hencken (the "2Q22 Report"). Accompanying the 2Q22 Report were certifications by Defendants Jamison and Hencken, attesting to the accuracy of the information in the 2Q22 Report.

### 1.    Revenue Recognition

102.    The 2Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

> The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***
>
> The Company determines revenue recognition through the following steps:
>
> - Identification of the contract, or contracts, with a customer
> - Identification of the performance obligations in the contract
> - Determination of the transaction price
> - Allocation of the transaction price to the performance obligations in the contract
> - Recognition of revenue when, or as, the Company satisfies a performance obligation
>
> The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. ***The***

– 31 –

*majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.*

(Emphasis added.)

103.    The 2Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

> The timing of the backlog is based on the requirement date indicated by our customers. ***However, based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.***

(Emphasis added.)

104.    The 2Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

> The timing of shipments is variable and based on several factors (including customer deposits, payments, availability of credit and delivery schedule changes), most of which are not within our control and can affect the timing of revenue recognition.

105.    The statements above in ¶¶ 102-104 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 101 were false when made due to the same misstatements.

106.    Additionally, the statements above in ¶¶ 102-104 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 101 were false when made due to the same misstatements.

– 32 –

### F. February 10, 2022 – 3Q22 Report

107.    On February 10, 2022, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended December 31, 2021 which was signed by Defendant Hencken (the "3Q22 Report"). Accompanying the 3Q22 Report were certifications by Defendants Jamison and Hencken, attesting to the accuracy of the information in the 3Q22 Report.

### 1. Revenue

108.    The 3Q22 Report stated the following, in pertinent part, regarding Capstone's revenue:

|  | Three Months Ended December 31, | |
|---|---|---|
|  | 2021 | 2020 |
| Revenue: | | |
| Product and accessories | $12,329 | $12,760 |
| Parts and service | 8,280 | 7,916 |
| Total revenue | 20,609 | 20,676 |

109.    The statement above regarding Capstone's revenue was materially false when made. In reality, Capstone's revenue for the quarter was $17,808,000, an overstatement of $2,801,000, or 16%. Additionally, the certifications in ¶ 107 were false when made due to the same misstatement.

### 2. Revenue Recognition

110.    The 3Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***

The Company determines revenue recognition through the following steps:

●    Identification of the contract, or contracts, with a customer

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

- Identification of the performance obligations in the contract
- Determination of the transaction price
- Allocation of the transaction price to the performance obligations in the contract
- Recognition of revenue when, or as, the Company satisfies a performance obligation

The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. *The majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.*

(Emphasis added.)

111. The 3Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

A portion of our backlog is concentrated in the oil and gas market which may impact the overall timing of shipments or the conversion of backlog to revenue. *The timing of the backlog is based on the requirement date indicated by our customers. However, based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.* …

(Emphasis added.)

112. The 3Q22 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

The timing of shipments is variable and based on several factors (including customer deposits, payments, availability of credit and delivery schedule changes), most of which are not within our control and can affect the timing of revenue recognition.

– 34 –

113.    The statements above in ¶¶ 110-112 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 107 were false when made due to the same misstatements.

114.    Additionally, the statements above in ¶¶ 110-112 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 107 were false when made due to the same misstatements.

## VII.    THE TRUTH BEGINS TO EMERGE BUT IS FURTHER OBFUSCATED

115.    On June 29, 2022, after market hours, Capstone filed with the SEC a Notification of Late Filing on Form 12b-25 regarding its 2022 Annual Report for the year ended March 31, 2022 (the "2022 NT 10-K"). The 2022 NT 10-K announced two issues and reasons why it could not timely file its 2022 Annual Report (defined below).

116.    First, the 2022 NT 10-K announced that:

The Company is still in the process of compiling required information to complete the Annual Report and Marcum LLP ("Marcum"), its independent registered public accounting firm, requires additional time to complete its audit of the consolidated financial statements as of and for the year ended March 31, 2022 to be incorporated in the Annual Report, *which includes, but is not limited to, completing its procedures pertaining to the Company's analysis regarding the collectability of certain customer accounts receivable* and auditing the Company's analysis of its ability to continue as a going concern as it relates to the Goldman Sachs waiver and amendment as described below.

(Emphasis added.)

117.    Second, the 2022 NT 10-K announced that:

– 35 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

The Company expects that its financial results for the year ended March 31, 2022 will result in the Company being in violation of certain of its financial covenants contained in its Amended and Restated Note Purchase Agreement, as amended (the "NPA"), with Goldman Sachs Specialty Lending Group, L.P. ("Goldman"). ***To address those defaults***, the Company has been working with Goldman to enter into a waiver and amendment to the NPA, which has consumed a significant amount of the Company's finance and accounting personnel's time. There can be no assurance that the Company will be able to enter into a waiver and amendment, and such waiver and amendment will likely impose additional burdens on the Company.

(Emphasis added.)

118.    On this news, Capstone's stock fell $0.25 per share, or 9.9%, to close at $2.26 per share on July 1, 2023, over the next two trading days. However, Defendants did not reveal the full truth of the Company's financial situation and continued to issue false and misleading statements.

## VIII.   FURTHER MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    *July 14, 2022 – 2022 Annual Report*

119.    On July 14, 2022, Capstone filed with the SEC its 2022 Annual Report on Form 10-K for the year ended March 31, 2022 which was signed by Defendants Jamison, Hencken, and Flexon (the "2022 Annual Report"). Accompanying the 2022 Annual Report were certifications by Defendants Jamison and Hencken, attesting to the accuracy of the information in the 2022 Annual Report.

### 1.    Revenue

120.    The 2022 Annual Report stated in pertinent part, regarding Capstone's revenue:

– 36 –

| | Year Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| Revenue: | | |
| Product and accessories | $ 37,181 | $ 36,517 |
| Parts and service | 32,464 | 31,119 |
| Total revenue | 69,645 | 67,636 |

121.   The statement above regarding Capstone's revenue was materially false when made. In reality, Capstone's revenue for the year was $63,964,000, an overstatement of $5,681,000, or 9%. Additionally, the certifications in ¶ 119 were false when made due to the same misstatement.

**2.      Revenue Recognition**

122.   The 2022 Annual Report also stated the following, in pertinent part, regarding revenue recognition:

> *[B]ecause our backlog represents only the estimated amount of future product revenue to be recognized under negotiated contracts as shipments convert backlog to recognized revenue for accounting purposes, we may not be able to fully realize the revenue value reported in our backlog, and our backlog may not be indicative of future revenues.* A portion of our backlog is concentrated in the international oil and gas market which may impact the overall timing of shipments or the conversion of backlog to revenue. *The timing of the backlog is based on the requirement date indicated by our customers. Based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. The timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.*

(Emphasis added).

123.   The 2022 Annual Report also stated the following, in pertinent part, regarding revenue recognition in its section titled "critical accounting matters":

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

●      Our revenue consists of sales of products, parts, accessories and service, which includes FPPs, net of discounts. Our distributors purchase products, parts and FPPs for sale to end users and are also required to provide a variety of additional services, including application engineering, installation, commissioning and post-commissioning service. ***Our standard terms of sales to distributors and direct end users include transfer of title, care, custody and control at the point of shipment***, payment terms ranging from full payment in advance of shipment to payment in 90 days, no right of return or exchange, and no post-shipment performance obligations by us except for warranties provided on the products and parts sold. ***We recognize revenue when all of the following criteria are met:*** persuasive evidence of an arrangement exists, ***delivery has occurred or service has been rendered***, selling price is fixed or determinable and collectability is reasonably assured.

(Emphasis added.)

124.   The 2022 Annual Report also stated the following, in pertinent part, regarding revenue recognition:

The timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and delivery schedule changes), most of which are not within our control and can affect the timing of our revenue.

125.   The statements above in ¶¶ 122-124 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 119 were false when made due to the same misstatement.

126.   Additionally, the statements above in ¶¶ 122-124 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 119 were false when made due to the same misstatement.

– 38 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

**B.      August 11, 2022 – 1Q23 Report**

127.    On August 11, 2022, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2022 which was signed by Defendant Robinson (the "1Q23 Report"). Accompanying the 1Q23 Report were certifications by Defendants Jamison and Robinson, attesting to the accuracy of the information in the 1Q23 Report.

**1.      Revenue Recognition**

128.    The 1Q23 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

**12.  Revenue Recognition**

The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***

The Company determines revenue recognition through the following steps:

- Identification of the contract, or contracts, with a customer
- Identification of the performance obligations in the contract
- Determination of the transaction price
- Allocation of the transaction price to the performance obligations in the contract
- Recognition of revenue when, or as, the Company satisfies a performance obligation

The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. ***The majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.***

– 39 –

(Emphasis added.)

129.    The 1Q23 Report also stated the following, in pertinent part, regarding Capstone's revenue recognition:

> A portion of our backlog is concentrated in the oil and gas market which may impact the overall timing of shipments or the conversion of backlog to revenue. ***The timing of the backlog is based on the requirement date indicated by our customers. However, based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.***

(Emphasis added.)

130.    The 1Q23 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

> The timing of shipments is variable and based on several factors (including customer deposits, payments, availability of credit and delivery schedule changes), most of which are not within our control and can affect the timing of revenue recognition.

131.    The statements above in ¶¶ 128-130 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 127 were false when made due to the same misstatements.

132.    Additionally, the statements above in ¶¶ 128-130 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 127 were false when made due to the same misstatements.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

**2.     Expenses**

133.    The 1Q23 Report stated that its costs of goods sold for parts, service, and rentals was $5,055,000.

134.    The foregoing statement was false and/or misleading because Capstone failed to disclose additional parts, service and rentals expenses of $1,391,000 from FPP contracts, and bill and hold expenses for parts, service and rentals of $36,000, resulting in actual costs of goods sold for parts, service and rentals of $6,482,000, understating expenses by $1,427,000, or 22%. Additionally, the certifications in ¶ 127 were false when made due to the same misstatement.

**C.     *November 14, 2022 – 2Q23 Report***

135.    On November 14, 2022, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2022 which was signed by Defendant Robinson (the "2Q23 Report"). Accompanying the 2Q23 Report were certifications by Defendants Jamison and Robinson, attesting to the accuracy of the information in the 2Q23 Report.

**1.     Revenue Recognition**

136.    The 2Q23 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

> The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***
>
> The Company determines revenue recognition through the following steps:
>
> - Identification of the contract, or contracts, with a customer
> - Identification of the performance obligations in the contract
> - Determination of the transaction price
> - Allocation of the transaction price to the performance obligations in the contract

– 41 –

● Recognition of revenue when, or as, the Company satisfies a performance obligation

The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, *which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. The majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.*

(Emphasis added.)

137.    The 2Q23 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

A portion of our backlog is concentrated in the oil and gas market which may impact the overall timing of shipments or the conversion of backlog to revenue. *The timing of the backlog is based on the requirement date indicated by our customers. However, based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue.*

(Emphasis added.)

138.    The statements above in ¶¶ 136-137 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold transactions. Additionally, the certifications in ¶ 135 were false when made due to the same misstatements.

139.    Additionally, the statements above in ¶¶ 136-137 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the

– 42 –

certifications in ¶ 135 were false when made due to the same misstatements.

### D.    February 13, 2023 – 3Q23 Report

140.    On February 13, 2023, Capstone filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended December 31, 2022 which was signed by Defendant Robinson (the "3Q23 Report"). Accompanying the 3Q23 Report were certifications by Defendants Jamison and Robinson, attesting to the accuracy of the information in the 3Q23 Report.

### 1.    Revenue Recognition

141.    The 3Q23 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

> The Company derives its revenues primarily from system sales, service contracts and professional services. ***Revenues are recognized when control of the systems and services is transferred to the Company's customers in an amount that reflects the consideration it expects to be entitled to in exchange for those services.***
>
> The Company determines revenue recognition through the following steps:
>
> - Identification of the contract, or contracts, with a customer
> - Identification of the performance obligations in the contract
> - Determination of the transaction price
> - Allocation of the transaction price to the performance obligations in the contract
> - Recognition of revenue when, or as, the Company satisfies a performance obligation
>
> The Company recognizes revenue when performance obligations identified under the terms of contracts with its customers are satisfied, ***which generally occurs, for systems, upon the transfer of control in accordance with the contractual terms and conditions of the sale. The majority of the Company's revenue associated with systems is recognized at a point in time when the system is shipped to the customer.***

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

(Emphasis added.)

142.   The 3Q23 Report stated the following, in pertinent part, regarding Capstone's revenue recognition:

> A portion of our backlog is concentrated in the oil and gas market, which may impact the overall timing of shipments or the conversion of backlog to revenue. ***The timing of the backlog is based on the requirement date indicated by our customers. However, based on historical experience, management expects that a significant portion of our backlog may not be shipped within the next 18 months. Additionally, the timing of shipments is subject to change based on several variables (including customer deposits, payments, availability of credit and customer delivery schedule changes), most of which are not in our control and can affect the timing of our revenue***.

(Emphasis added.)

143.   The statements above in ¶¶ 141-142 regarding Capstone's revenue recognition were materially false when made for claiming that revenue is recognized upon shipment because they failed to disclose that Capstone recognized revenue based on undisclosed bill-and-hold "transactions". Additionally, the certifications in ¶ 140 were false when made due to the same misstatements.

144.   Additionally, the statements above in ¶¶ 141-142 regarding Capstone's revenue recognition were materially false when made because Defendants caused shipments to improperly go to third party warehouses. Additionally, the certifications in ¶ 140 were false when made due to the same misstatements.

**2.   Expenses**

145.   The 3Q23 Report stated that cost of goods sold for parts, service, and rentals was $5,307,000.

146.   The foregoing statement was false and/or misleading because Capstone failed to disclose additional parts, service and rentals expenses of $1,519,000 from FPP contracts, and bill and hold expenses for parts, service and

– 44 –

rentals of $17,000, resulting in actual costs of goods sold for parts, services and rentals of $6,843,000, understating expenses by $1,536,000, or 22%. Additionally, the certifications in ¶ 140 were false when made due to the same misstatement.

## IX.    TRUTH CONTINUES TO EMERGE

147.    On June 30, 2023, after market hours, Capstone filed with the SEC a Notification of Late Filing on Form 12b-25 regarding its 2023 Annual Report for the year ended March 31, 2023 (the "2023 NT 10-K").[13] This 2023 NT 10-K announced two issues and reasons why it could not timely file its 2023 Annual Report.

148.    First, the 2023 NT 10-K announced that:

> The Company is still in the process of compiling required information to complete the Annual Report and Marcum LLP ("Marcum"), its independent registered public accounting firm, requires additional time to complete its audit of the consolidated financial statements as of and for the year ended March 31, 2023 to be incorporated in the Annual Report, which includes, but is not limited to, ***completing its procedures pertaining to certain matters being reviewed by the Company's Audit Committee and matters relating to the NPA (as defined below).***

(Emphasis added.)

149.    Second, the 2023 NT 10-K announced that:

> ***As the end of the year ended March 31, 2023 the Company was, and the Company currently is, in violation of certain of its covenants, including the minimum liquidity covenant, contained in its Amended and Restated Note Purchase Agreement, as amended (the "NPA"), with Goldman Sachs Specialty Lending Group, L.P. ("Goldman").*** To address those defaults and other matters (including the maturity of the notes on October 1, 2023), the Company has been working with Goldman to enter into a waiver and amendment to the NPA, which has consumed a significant amount of the Company's finance and

[13] On July 5, 2023, Capstone filed an amended 2023 NT 10-K which merely checked a box and did not change the substance of the 2023 NT 10-K in any way.

– 45 –

accounting personnel's time. There can be no assurance that the Company will be able to enter into a waiver and amendment, and such waiver and amendment will likely impose additional burdens on the Company.

(Emphasis added.)

150.  On this news, as investors first learned of a risk that Capstone's financial statements were misstated, Capstone's stock fell $0.03 per share, or 2.5%, to close at $1.17 per share on July 3, 2023, the next trading day. Capstone's stock continued to fall another $0.04 per share to close at $1.13 per share on July 5, 2023. On July 6, 2023, the stock traded as low as $1.06 per share, an all-time low at that time.

151.  On August 15, 2023, after market hours, Capstone filed with the SEC a Notification of Late Filing on Form 12b-25 regarding its periodic report for the quarter ended June 30, 2023 (the "NT 10-Q"). The NT 10-Q announced that "*[t]he delays are attributable in large part to the ongoing review and investigations by the Audit Committee of financial reporting and other matters.*" (Emphasis added.)

152.  On this news, the first announcement of an "investigation" into "financial reporting and other matters", Capstone's stock fell $0.0535 per share, or 5.7%, to close at $0.8865 per share on August 16, 2023 as investors further learned about the seriousness of a risk that Capstone's financial statements were misstated.

153.  On August 18, 2023, after market hours, Capstone filed with the SEC a current report on Form 8-K in which it announced a fifth amended and restated Note Agreement and that it had received written notice from Nasdaq that it was not in compliance with Nasdaq Listing Rule 5250(c)(1) for failing to timely file its 1Q24 quarterly report (the "10-Q Notice of Delisting 8-K").

154.  The 10-Q Notice of Delisting 8-K also attempted to downplay the risks the Company faced, stating in relevant part:

The Notice from Nasdaq is only a notification of deficiency, not of

imminent delisting, and has no current effect on the listing or trading of the Company's securities. Under the Nasdaq Listing Rules, the Company has 60 calendar days from August 16, 2023 to submit a plan to regain compliance, and, if the plan is accepted, Nasdaq may grant an exception of up to 180 calendar days from the Form 10-Q's due date, or until February 12, 2024, to regain compliance. As previously reported on its Current Report on Form 8-K dated March 31, 2023, the Company received a written notice from the Nasdaq Listing Qualifications Department notifying the Company that for the last 30 consecutive business days, the Company's Market Value of Listed Securities ("MVLS") was below the minimum of $35 million required for continued listing on The Nasdaq Capital Market pursuant to Nasdaq Listing Rule 5550(b)(2). In accordance with Nasdaq Listing Rule 5810(c)(3)(C), the Company was provided a period of 180 calendar days, or until September 25, 2023, to regain compliance.

155.    On this news, Capstone's stock fell $0.2609 per share, or 31%, to close at $0.5801 per share on August 21, 2023, the next trading day. Capstone's stock continued to fall on this news until closing at $0.4639 per share on August 24, 2023.

156.    On September 22, 2023, after market hours, Capstone filed with the SEC a current report on Form 8-K in which it announced that it had entered into the sixth amended and restated Note Agreement (the "Sixth Amended Note 8-K"). The Sixth Amended Note 8-K then also announced the need for restatements due to the improper bill-and-hold "transactions", stating in relevant part:

On September 19, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company, in consultation with the Company's management, determined that, as a result of apparent errors primarily related to revenue recognition associated with bill and hold transactions that were identified in the course a review by the Audit Committee of certain financial reporting related and other matters, ***the Company's previously issued consolidated financial statements as of each and for each of the following fiscal periods are materially incorrect, require restatement and should no longer be relied upon*** :

● ***The first three fiscal quarters of the fiscal year ended March 31, 2023 and the comparable periods of the fiscal year ended March***

– 47 –

*31, 2022;*
- ***The fiscal year ended March 31, 2022; and***
- ***The fiscal year ended March 31, 2021 (the "Subject Periods").***

The Company currently intends to file the restated financial statements with the U.S. Securities and Exchange Commission (the "SEC") as soon as practicable after the Audit Committee's ongoing review is complete, the restated financial statements are complete and have been audited or reviewed by Marcum LLP ("Marcum"), the Company's independent registered accounting firm, and the required periodic reports are finalized.

***"Bill and hold" sales generally are sales meeting specified criteria under U.S. generally accepted accounting principles ("GAAP") to recognize revenue at the time title to goods is transferred to the customer, even though the seller does not ship the goods to the customer until a later time.*** In typical sales transactions other than those accounted for as bill and hold, title to goods is transferred to the customer at the point of shipment or delivery. ***As a result of a review concerning the Subject Periods, conducted with the assistance of independent advisors, the Audit Committee identified numerous instances where bill and hold transactions did not appear to meet the requirements for revenue recognition under GAAP. As a result, the Audit Committee has concluded that, in most such cases, revenue should not have been recognized until a later time when the products were subsequently shipped to the customer. As a result, the revenue and the related cost of goods sold reported by the Company for each of the Subject Periods does not accurately reflect the revenue earned in such periods.***

The restatement of the financial statements has not been completed, and the full impact of the errors on the Company's previously filed financial statements has not yet been determined.

Due to the impact of the above matters on the presentation of the Company's financial statements in its Form 10-K for the fiscal year ended March 31, 2023, in its Form 10-Q for the quarter ended June 30, 2023 and in its Form 10-Q for the quarter ended September 30, 2023, the Company has not timely filed its Annual Report on Form 10-K for

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

the fiscal year ended March 31, 2023 or its Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2023 with the SEC, and may not timely file its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2023. The Company's ongoing negotiations with the Collateral Agent and the Purchaser also contributed to the delays in filing its Annual Report and Quarterly Report.

As part of the consideration of the above-described matters, the Company has and *will continue to assess the underlying internal control deficiencies that allowed these issues to go undetected and will provide its conclusion regarding control deficiencies and remedial measures in the filings referenced in this Item 4.02.*

(Emphasis added.)

157.    The disclosure that Capstone had misstated bill-and-hold transactions confirmed the risk disclosed on June 30, 2023 and August 15, 2023. Because the market had already absorbed the news that there was a serious risk that Capstone's financial statements were misstated, its stock price did not decline, but in fact rose from $.551 to $.57 on September 25, 2023, the following trading day.

158.    Then on September 28, 2023, during market hours, Capstone filed with the SEC a current report on Form 8-K in which it announced that it had filed for bankruptcy that morning with a prepackaged plan in which its Note Agreement partners were heavily involved (the "Bankruptcy 8-K"). The Bankruptcy 8-K also revealed that the Company had received a Delisting Letter from NASDAQ two days earlier on September 26, 2023.

159.    On this news, the price of Capstone stock continued to decline over the following three days to close at $0.31 per share on October 3, 2023.

160.    On June 13, 2024, Capstone finally filed with the SEC its long-awaited Amended 2022 Annual Report. The Amended 2022 Annual Report contained the following explanatory note:

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

As previously disclosed in the Current Report on Form 8-K of the Company with the SEC on September 19, 2023, the Audit Committee of the Board Directors of the Company (the "Audit Committee"), in consultation with Company's management, concluded that, as a result of apparent errors primarily related to revenue recognition associated with bill and hold transactions, certain previously issued consolidated financial statements were materially incorrect and should no longer be relied upon.

As a result of the Investigation and additional procedures performed by management, the Audit Committee and management, in consultation with the Company's independent auditors, determined that certain previously issued financial statements were required to be restated to correct for the following: (i) Revenue recognition related to bill-and-hold arrangements; (ii) Accounting for factory protection plan contracts; and (iii) Reclassification of term note payable.

As previously reported in the Current Report on Form 8-K of the "Company filed with the Securities and Exchange Commission (the "SEC") on September 28, 2023, the Company and its wholly owned direct subsidiaries, Capstone Turbine International, Inc. and Capstone Turbine Financial Services, LLC. (together with the Company, the "Debtors"), commenced voluntary proceedings under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Concurrent with the petition, the Debtors (i) entered into the Transaction Support Agreement ("TSA") with the pre-petition senior secured creditor, Broad Street Credit Holdings, LLC. ("Broad Street"), and Goldman Sachs Specialty Lending Group, L.P. (the "Collateral Agent") and (ii) filed with the Bankruptcy Court a joint prepackaged Chapter 11 plan of reorganization (as amended, restated, supplemented or otherwise modified from time to time, the "Plan").

On October 24, 2023, in accordance with the TSA and the Plan, the Debtors filed a supplement to the Plan (the "Plan Supplement") with the Bankruptcy Court.  On November 9, 2023, the Debtors filed certain additional exhibits to the Plan Supplement. On November 14, 2023, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Plan, including the Plan Supplement and all exhibits and schedules thereto, and all other documents filed in connection with the

– 50 –

Plan. On December 7, 2023 (the "Effective Date"), the Plan, including the Plan Supplement and all exhibits and schedules thereto, became effective in accordance with its terms and the Debtors emerged from the Chapter 11 Cases (as defined below) without any need for further action or order of the Bankruptcy Court.

In connection with the Plan, on December 7, 2023, the Company completed a series of transactions pursuant to which, among other things, Capstone Turbine International, Inc. was re-named "Capstone Green Energy Holdings, Inc." and became the successor to Capstone Green Energy Corporation for SEC reporting purposes by operation of Rule 12g-3(a) under the Securities Exchange Act of 1934, as amended. The Company is filing this Amendment No. 1 (the "Amendment No. 1") to the Company's Annual Report on Form 10-K for the year ended March 31, 2022, originally filed with the Securities and Exchange Commission on July 14, 2023 (the "Original Report"). This Amendment No. 1 is being filed to restate certain information presented in the Original Report.

161.  The Amended 2022 Annual Report went on to state:

**Audit Committee Investigation in Respect of FPP**

Based on information learned as part of the Restatement process, the Audit Committee commenced an additional investigation (the "FPP Investigation" and, together with the Revenue Recognition Investigation, the "Audit Committee Investigations") into FPP related practices. The FPP Investigation was conducted with the assistance of outside counsel retained by the Audit Committee. Through the FPP Investigation, the Audit Committee identified evidence that, at times during the fiscal years covered in this Annual Report, former senior executives delayed shipment of available parts under the FPP and delayed recording the associated expense on the Company's financial statements. The Audit Committee Investigations found no evidence that either the Audit Committee, the full Board or current executive officers were aware of such activity.  The financial statement impact of such activity in prior reporting periods, if any, has been addressed through the Company's Restatement. As part of the Restatement process, the Company corrected its accounting treatment of FPP expenses so that claims are recorded at the time a claim is received and accepted, as opposed to when the claim is satisfied.

– 51 –

162.    In admitting that Capstone had material weaknesses in its internal controls, the Amended 2022 Annual Report stated that:

> There was an inappropriate tone at the top established by certain former senior executives. For example, certain former senior executives delayed shipments of parts under the FPP service contracts, which because of our incorrect accounting for our FPP program resulted in delayed recording of the associated expense and liabilities on the Company's financial statements. These business practices were also not properly communicated to our Board, Audit Committee, or independent registered public accounting firm.

163.    The Amended 2022 Annual Report also contained notes to Capstone's financial statements describing Capstone's prior misstatements, such as the following regarding Capstone's undisclosed bill-and-hold arrangements:

**Description of Misstatements**

The following include descriptions of the significant adjustments to the Company's financial position and results of operations from previously reported consolidated financial statements.

***Revenue Recognition of Bill-and-Hold Arrangements ("Bill and Hold")*** The Company previously recognized revenue related to the sale of products, parts, and accessories at the point of shipment. In certain circumstances, the Company recognized revenue when the order is shipped to an in-transit warehouse where it is held until it is shipped to the customer. Under ASC 606, Revenue from Contracts with Customers ("ASC 606"), revenue recognized under bill-and-hold arrangements are required to meet specific criteria including: (i) the reason for the bill-and-hold arrangement is substantive, (ii) the product is segregated from the Company's other inventory items held for sale, (iii) the product is ready for shipment to the customer, and (iv) the Company does not have the ability to use the product or direct it to another customer. As the Company's previous revenue recognition policy did not correctly apply the required criteria to recognize revenue related to bill-and-hold arrangements, the Company concluded certain revenue related to bill-and-hold arrangements was prematurely recognized. The Company has revised the revenue recognition process,

– 52 –

and related internal controls, to properly consider the required bill-and-hold criteria.

To correct this error, (i) the revenue and cost of goods sold were reversed in the period in which the accounting errors took place, (ii) the revenue and cost of goods sold was recognized in subsequent periods when all of the revenue recognition criteria had been met, and (iii) the bad debt expense relating to the accounts receivable associated with prematurely recognized revenue was reversed in the periods prior to achieving the revenue recognition criteria and recognized in subsequent periods consistent with the Company's policy. Additionally, the related adjustments to accounts receivable, inventory, and deferred revenue were made in the consolidated financial statements for the relevant Restated Periods.

164.    The Amended 2022 Annual Report also contained notes to Capstone's financial statements describing Capstone's prior misstatements, such as the following regarding Capstone's FPP misstatements:

**Recognition of the Factory Protection Plan Contracts ("FPP Contracts")** The Company offers a comprehensive factory protection plan ("FPP") to microturbine system customers guaranteeing service in the form of labor and spare parts to maintain product performance. For a fixed fee, the customer can purchase a FPP for either spare parts only or spare parts and labor reimbursement. The Company previously recognized the FPP revenue on a straight-line basis for the term of the contract, typically 5, 10, 15, or 20 years, and recorded the costs when the replacement parts shipped and when the labor reimbursement request was received. In addition, FPP revenues and costs were presented on a gross basis in the Consolidated Statements of Operations.

As part of the restatement process, the Company reviewed the previous accounting conclusions related to FPP recognition including a separate analysis of the spare parts and labor reimbursement offerings and the general terms of the contract. The Company concluded the timing of cost recognition was improperly delayed and the cost should be recognized when the customer orders the spare parts. As it relates to the accounting for labor reimbursement ("FPP Labor"), the income, based on the respective standalone selling price, and related costs should be

– 53 –

presented on a net basis in the Consolidated Statements of Operations. In addition, the Company concluded the FPP contract term is 30 days, as the customer has the right to cancel with a 30-day notice. The Company has since revised its policy, and related internal controls, to properly consider the recognition of FPP contracts.

To correct this error, as it relates to FPP Parts, the cost of goods sold was recognized at the time the spare parts order was received and a liability was recognized for any orders that had not been shipped to the customers in the period the accounting error took place. As it relates to FPP Labor, the labor reimbursement cost was reversed out of cost of goods sold and reclassified to revenue, net. The Company also revised the FPP contract disclosure included in Note 3 – Summary of Significant Accounting Policies to reflect the revised classification of the contract term.

165.    The Amended 2022 Annual Report also contained notes to Capstone's financial statements describing Capstone's prior misstatements, such as the following regarding Capstone's earlier Note Agreement breach:

*Note Classification* As a result of our restated earnings, we were in breach of the Consolidated Adjusted EBITDA Financial Covenant to the Note Purchase Agreement dated as of December 9, 2019, and later amended for the quarter ended June 30, 2021. The breach required a reclassification of the term note payable to a current liability on our consolidated balance sheets for the year ended March 31, 2022, and each of the interim financial statements for the quarterly periods in 2022. For further discussion on the Company's ability to continue as a going concern see Note 3 – Summary of Significant Accounting Policies.

166.    Also included in the Amended 2022 Annual Report was a discussion by Capstone's independent accounting firm, Marcum LLP, that discussed Capstone's improper revenue recognition. It stated:

The Company's revenues totaled approximately $64.0 million and $67.6 million for the years ended March 31, 2022 and 2021, respectively. In various instances, the sales of products, parts, and accessories were shipped and held at third party warehouses until the time in which the customer took possession of the goods. As described

– 54 –

in Note 2 to the consolidated financial statements, the Company previously accounted for such sales incorrectly which required the consolidated financial statements to be restated to correct the errors associated with these transactions. Material weaknesses in the Company's internal control over financial reporting were also identified as a result of the restatement.

167.   Marcum went on to discuss Capstone's improper revenue recognition, stating:

The Company's factory protection plan ("FPP") liability as of March 31, 2022 and 2021 was $9.1 million and $7.7 million, respectively. The Company historically accounted for the costs of such factory protection plans at the time it delivered the spare parts to the customer.  However, as disclosed in Note 2 to the consolidated financial statements, the Company determined the historical accounting for such transactions was incorrect as the costs of the factory protection plans should be recognized at the time the customer orders the spare part. The correction of this error required the consolidated financial statements to be restated. Material weaknesses in the Company's internal control over financial reporting were also identified as a result of the restatement.

168.   That same day, Capstone released its 2023 Annual Report, which reiterated the above details regarding Defendants' restatements, and restating financial information for Q1 through Q3 of 2023. A chart outlining all of the restatements of earnings as set forth in the Amended 2022 10-K and the 2023 Annual Report, as relevant to this Complaint, are set forth in Appendix A.

169.   As a result of Defendants' wrongful acts (including obfuscating the emergence of the truth) and omissions, and the decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## X.   **ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER**

### A.   *Additional Allegations Supporting Defendant Jamison's Scienter*

170.   In Capstone's long-awaited Amended 2022 Annual Report, the

– 55 –

Company revealed that Defendant Jamison, as a former executive officer, was aware of and a part of the revenue and expenses scheme. In particular, the Company revealed that former senior executives, like Defendant Jamison, "delayed shipment of available parts under the FPP and delayed recording the associated expense on the Company's financial statements."

171.   Capstone's desperate financial condition and need to raise additional financing gave Defendant Jamison motive to commit fraud. Defendant Jamison knew throughout the Class Period that Capstone would be required to raise additional financing if it was to survive as a going concern beyond October 1, 2023. As an example, Capstone's 2Q23 Report included its first going concern warning, acknowledging that there was doubt about the Company's ability to continue as a going concern beyond 12 months. The 2Q23 Report discussed that this was due to the $51.0 million of debt due October 1, 2023 pursuant to the Note Agreement. Given the need to raise additional financing to continue the Company as a going concern, Defendant Jamison had a strong motive to misrepresent the Company's revenue and operations.

172.   In addition, the simplicity and obviousness of the accounting standards at issue support a strong inference of Defendant Jamison's scienter. The difference between recognizing revenue when an item is shipped and recognizing revenue before the item is shipped is clear and straightforward. Similarly, the fact that expenses for replacement parts must be recognized when the customer requests the part, rather than when shipped, is simple and obvious.

173.   Further supporting an inference of scienter is the fact that Capstone identified its revenue recognition policy as a "critical accounting policy". *See* ¶¶ 85, 123.

174.   Defendant Jamison's scienter can also be inferred from the small size of the Company. As of March 31, 2022, Capstone had approximately 133 full-time employees and one part-time employee. Capstone's executive offices and its *own*

warehouse are collocated in the same facility, and Capstone sold an average of a mere 52 microturbines per quarter during the Class Period, making it obvious that Capstone was not holding inventory pursuant to legitimate bill-and-hold transactions nor utilizing third party warehouses and delaying shipments for any proper purpose.

175. Further supporting Defendant Jamison's scienter is the fact that he executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to Capstone's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendant Jamison was "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures."

176. Additionally, Defendant Jamison's financial acumen was highlighted in Capstone's filings such as in the July 29, 2022 Proxy Statement filed on a Schedule 14A, stating: "He holds a Bachelor of Arts degree in Business Administration and Finance from Seattle University."

177. Accordingly, Defendant Jamison knew, or at the very least was severely reckless in not knowing, of the facts which rendered his public statements materially false and misleading.

**B.    Additional Allegations Supporting Defendant Robinson's Scienter**

178. In Capstone's long-awaited Amended 2022 Annual Report, the Company also revealed that Defendant Robinson, as a former executive officer, was aware of and a part of the revenue and expenses scheme. In particular, the Company revealed that former senior executives, like Defendant Robinson, "delayed shipment of available parts under the FPP and delayed recording the associated expense on the Company's financial statements."

179. Capstone's desperate financial condition and need to raise additional

– 57 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

financing gave Defendant Robinson motive to commit fraud. Defendant Robinson knew throughout the Class Period that Capstone would be required to raise additional financing if it was to survive as a going concern beyond October 1, 2023. As an example, Capstone's 2Q23 Report included its first going concern warning, acknowledging that there was doubt about the Company's ability to continue as a going concern beyond 12 months. The 2Q23 Report discussed that this was due to the $51.0 million of debt due October 1, 2023 pursuant to the Note Agreement. Given the need to raise additional financing to continue the Company as a going concern, Defendant Robinson had a strong motive to misrepresent the Company's revenue and operations.

180.   In addition, the simplicity and obviousness of the accounting standards at issue support a strong inference of Defendant Robinson's scienter. The difference between recognizing revenue when an item is shipped and recognizing revenue before the item is shipped is clear and straightforward. Similarly, the fact that expenses for replacement parts must be recognized when the customer requests the part, rather than when shipped, is simple and obvious.

181.   Further supporting an inference of scienter is the fact that Capstone identified its revenue recognition policy as a "critical accounting policy". *See* ¶¶ 85, 123.

182.   Defendant Robinson's scienter can also be inferred from the small size of the Company. As of March 31, 2022, Capstone had approximately 133 full-time employees and one part-time employee. Capstone's executive offices and its *own* warehouse are collocated in the same facility, and Capstone sold an average of a mere 52 microturbines per quarter during the Class Period, making it obvious that Capstone was not holding inventory pursuant to legitimate bill-and-hold transactions nor utilizing third party warehouses and delaying shipments for any proper purpose.

183.   Further supporting Defendant Robinson's scienter is the fact that he

– 58 –

executed certifications pursuant to SOX Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to Capstone's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendant Robinson was "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures."

184. Additionally, Defendant Robinson's financial abilities were highlighted in Capstone's filings such as the July 11, 2022 current report on Form 8-K which announced his appointment. In that current report, the Company stressed his resume of senior finance positions and that he "is a Certified Public Accountant (inactive), and a graduate of the University of Southern California, with an MBA from the University of California."

185. Accordingly, Defendant Robinson knew, or at the very least was severely reckless in not knowing, of the facts which rendered his public statements materially false and misleading.

### C.    *Additional Allegations Supporting Defendant Hencken's Scienter*

186. In Capstone's long-awaited Amended 2022 Annual Report, the Company also revealed that Defendant Hencken, as a former executive officer, was aware of and a part of the revenue and expenses scheme. In particular, the Company revealed that former senior executives, like Defendant Hencken, "delayed shipment of available parts under the FPP and delayed recording the associated expense on the Company's financial statements."

187. Capstone's desperate financial condition and need to raise additional financing gave Defendant Hencken motive to commit fraud. Defendant Hencken knew throughout the Class Period that Capstone would be required to raise additional financing if it was to survive as a going concern beyond October 1, 2023. Given the need to raise additional financing to continue the Company as a going concern, Defendant Hencken had a strong motive to misrepresent the Company's

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

revenue and operations.

188.    In addition, the simplicity and obviousness of the accounting standards at issue support a strong inference of Defendant Hencken's scienter. The difference between recognizing revenue when an item is shipped and recognizing revenue before the item is shipped is clear and straightforward. Similarly, the fact that expenses for replacement parts must be recognized when the customer requests the part, rather than when shipped, is simple and obvious.

189.    Further supporting an inference of scienter is the fact that Capstone identified its revenue recognition policy as a "critical accounting policy". *See* ¶¶ 85, 123.

190.    Defendant Hencken's scienter can also be inferred from the small size of the Company. As of March 31, 2022, Capstone had approximately 133 full-time employees and one part-time employee. Capstone's executive offices and its *own* warehouse are collocated in the same facility, and Capstone sold an average of a mere 52 microturbines per quarter during the Class Period, making it obvious that Capstone was not holding inventory pursuant to legitimate bill-and-hold transactions nor utilizing third party warehouses and delaying shipments for any proper purpose.

191.    Further supporting Defendant Hencken's scienter is the fact that he executed certifications pursuant to SOX Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to Capstone's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendant Hencken was "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures."

192.    Additionally, Defendant Hencken's financial abilities were highlighted in Capstone's filings such as the August 30, 2019 current report on Form 8-K which announced his appointment as Interim CFO. In that current report,

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

the Company stressed his resume of senior finance positions and that he "holds a Bachelor of Science degree in Accounting from California State University, Long Beach and is a Certified Public Accountant (active) licensed in California."

193.    Accordingly, Defendant Hencken knew, or at the very least was severely reckless in not knowing of the facts which rendered his public statements materially false and misleading.

### D.    Additional Allegations Supporting Capstone's Scienter

194.    The scienter of the Defendants is imputable to Capstone.

195.    In addition, Capstone's admission in its 10-K for the year 2023 that "[t]here was an inappropriate tone at the top [of Capstone] established by certain former senior executives.  For example, certain former senior executives delayed shipments of parts under the FPP service contracts, which because of our incorrect accounting for our FPP program resulted in delayed recording of the associated expense and liabilities on the Company's financial statements." Those former executives' intentional fraudulent acts, including delaying of shipment in order to delay recording of associated expenses and liabilities on the Company's financial statements, as well as the practice of sending products to third-party warehouses to conceal the use of bill and hold transactions is attributable Capstone and therefore supports a strong inference of scienter.

## XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Capstone during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

197.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

198.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

199.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

200.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendants' acts as alleged violated the federal securities laws;

(b)   whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)   whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

– 62 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

(d)    whether the Defendants caused the Company to issue false and misleading filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading filings and public statements during the Class Period;

(f)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

201.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

202.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with sufficient volume during the Class Period; on average during the Class Period 569,970 shares of Capstone traded weekly, or 3.1% of the shares outstanding;

(e)    the Company traded on NASDAQ and was covered by 17 analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a

– 63 –

reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

203.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

204.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against Defendants Jamison, Robinson, and Hencken

205.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.    This Count is asserted against Defendants Jamison, Robinson, and Hecken (the "10(b) Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

207.    During the Class Period, the 10(b) Defendants, individually and in concert, directly or indirectly, disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained misrepresentations and failed to disclose material facts

– 64 –

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208.   The 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

209.   The 10(b) Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

210.   The 10(b) Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

– 65 –

211.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the 10(b) Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the 10(b) Defendants' false and misleading statements.

212.   Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the 10(b) Defendants' misleading statements and by the material adverse information which the Company's and the 10(b) Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

213.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

214.   By reason of the foregoing, the Company and the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against All Defendants**

215.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

216.   During the Class Period, the Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's

– 66 –

business practices.

217.   As officers and/or directors of a publicly owned company, the Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

218.   Because of their positions of control and authority as senior officers, the Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

219.   Each of the Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

220.   By reason of the above conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action

1  under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as

2  Class representatives;

3      B.      Requiring Defendants to pay damages sustained by Plaintiffs and the

4  Class by reason of the acts and transactions alleged herein;

5      C.      Awarding Plaintiffs and the other members of the Class prejudgment

6  and post-judgment interest, as well as their reasonable attorneys' fees, expert fees

7  and other costs; and

8      D.      Awarding such other and further relief as this Court may deem just and

9  proper.

10              ## DEMAND FOR TRIAL BY JURY

11      Plaintiffs hereby demand a trial by jury.

12

13

14

15  Dated: July 29, 2024              Respectfully submitted,

16                                    **THE ROSEN LAW FIRM, P.A.**

17

18                                    */s/ Jonathan Stern*
                                      Jonathan Stern (*pro hac vice*)
19                                    275 Madison Avenue, 40th Floor
                                      New York, NY 10016
20                                    Telephone: (212) 686-1060
                                      Facsimile: (212) 202-3827
21                                    Email: jstern@rosenlegal.com
22
                                      Laurence M. Rosen, Esq. (SBN 219683)
23                                    355 S. Grand Avenue, Suite 2450
                                      Los Angeles, CA 90071
24                                    Telephone: (213) 785-2610
                                      Facsimile: (213) 226-4684
25                                    Email: lrosen@rosenlegal.com
26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**POMERANTZ LLP**
Brenda Szydlo (*pro hac vice*)
Dean P. Ferrogari (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-661-1100
Facsimile: 917-463-1044
bszydlo@pomlaw.com
dferrogari@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: 310-405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Plaintiffs and the
Proposed Class*

**SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
brian@schallfirm.com

*Additional Counsel to Lead Plaintiff*

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS, Case No. 2:23-cv-08659-HDV-MAR